## KUJAWA ET AL. *v.* BALTIMORE TRANSIT COMPANY ET AL.

[No. 115, September Term, 1960.]

*Decided January 18, 1961.*

*Motion for rehearing filed January 24, 1961, denied February 17, 1961.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*I. Duke Avnet,* with whom was *Herman Shapiro* on the brief, for the appellants.

*Patrick A. O'Doherty,* with whom was *William A. Hegarty* on the brief, for the Baltimore Transit Company, one of the appellees.

*Frederick J. Green, Jr.,* with whom were *Lord, Whip, Coughlan & Green* on the brief, for George Ford, the other appellee.

HORNEY, J., delivered the opinion of the Court.

Claiming, primarily, that the jury verdicts were inadequate, the plaintiffs-appellants (the Kujawas, Elizabeth M., Sylvester H., and Sylvester A., mother, son and husband-father respectively) appealed from the judgments entered by the trial court on the verdicts for and against the defendants-appellees (The Baltimore Transit Company and George Ford).

The jury assessed total damages of $3,315—$500 to the mother and $2,700 to the son for personal injuries and $115 to the husband-father for loss of services and hospital and medical expenses—against both defendants, but the trial court entered a judgment *n.o.v.* in favor of the transit company on the ground that there was no evidence of negligence on its part.

The claim for damages arose out of a collision between a bus of the transit company with an automobile owned and operated by Ford, in which the mother and son were passengers. The accident occurred on November 21, 1956, at the intersection of Eastern Avenue and 54th Street in the village of Colgate in Baltimore County. There was no dispute as to the liability of Ford, but, as will later appear, there was a wide difference of opinion as to the extent of the personal injuries sustained by the mother and son.

The Kujawas attack the verdicts and judgments in five general areas claiming (i) that the trial court erred when it refused to propound a question to the prospective jurors on *voir dire* intended to ascertain the existence of bias or prejudice with respect to the size of jury verdicts; (ii) that the trial court erred in rulings on the evidence and in its instructions to the jury; (iii) that the trial court, by its caustic remarks and minimization of the extent of the injuries sustained by the mother and son, prevented the plaintiffs from having a fair trial; (iv) that the verdicts were grossly inadequate; and (v) that it was error to grant the transit company a judgment *n.o.v.* With respect to this last contention we note that the appellants raise it only in the alternative, apparently apprehensive that if this Court should reverse the judgments for one or more of the other reasons assigned, the grant of the motion would be unassailable at a new trial unless raised in this appeal.

(i)

The *voir dire* question submitted was:

"Have you read any article or literature or have you heard any discussion recently on amounts of verdicts in negligence cases, and, if so, have you formed any ideas with reference to amounts of jury verdicts?"

The plaintiffs aver that this question was motivated by their desire to counteract what they characterize as a "steady stream of indoctrination" flowing from the insurance companies to the public generally in such volume as to adversely affect jury verdicts in negligence cases of plaintiffs having honest claims. The claim is, because the court refused to ask the question, that "persons sat on the jury panel who were obviously predisposed against bringing in an adequate jury verdict." There is nothing in the record, however, to support the contention or to show that the plaintiffs were prejudiced by the action of the court. The question was therefore properly excluded. Clearly the interrogatory, assuming the subject of the inquiry was proper, was not so framed as to probe for the existence of cause for disqualification which is the sole purpose of the *voir dire* examination. *Grossfeld v. Braverman,* 203 Md. 498, 101 A. 2d 824 (1954). Even if a juror had formed or expressed an opinion as to the adequacies or inadequacies of jury verdicts in negligence cases, that fact would not have disqualified him. A juror to be competent need not be devoid of all beliefs and convictions. All that may be required of him is that he shall be without bias or prejudice for or against the parties to the cause and possess an open mind to the end that he may hear and consider the evidence produced and render a fair and impartial verdict thereon. *Garlitz v. State,* 71 Md. 293, 18 Atl. 39 (1889). Moreover, since the question was in the nature of a "fishing" expedition condemned by us in other cases—see, for example, *Emery v. F. P. Asher, Jr., & Sons, Inc.,* 196 Md. 1, 75 A. 2d 333 (1950)—the denial of it by the trial court was clearly not an abuse of its wide discretion in the matter. Other than this we can add nothing to the recent pronouncements of this Court where it has been called upon to determine the propriety of questions asked on *voir dire.* See, for instance, *Casey v. Roman Catholic Arch. of Baltimore,* 217 Md. 595, 143 A. 2d 627 (1958), a civil case, and *Brown v. State,* 220 Md. 29, 150 A. 2d 895 (1959), a criminal case. The exclusion of the question was proper.

(ii)

Since three of the five assignments of error in rulings on

the evidence and instructions to the jury involve one or more phases of the testimony of Dr. Andrew C. Gillis, we shall consider these first and then the other two involving loss of wages and the medical bills.

In addition to a thumb injury (the causal connection of which was disputed), which subsequently required an operation resulting in a "fifteen per cent permanent partial disability," and an injury to her knee, the mother also testified as to the emotional or nervous symptoms, such as headaches, dizzy spells, blackouts and blurred vision, she claims she had suffered as a result of her worries about her son. But, when Dr. Gillis was asked if he could state an opinion as to the probability of the cause of the emotional and nervous conditions of the mother, he replied that he could not "be definite about it at all" and explained his answer by adding that "there are so many causes for general nervousness that it is very hard to state at this late stage just how much the accident had to do with the woman's condition." Despite this admission and explanation, however, counsel for the Kujawas, in an effort to establish a causal connection, made numerous other attempts to have the doctor testify to the probability that the mental condition of the mother was the result of the accident, but each question was objected to and each objection was sustained by the court. And, at the close of the evidence, the court, in its instructions to the jury, though not excluding recovery of damages for the mental condition caused by fear for her son as the result of having witnessed the accident, refused to allow recovery for any condition caused by worry as to what the future might hold for the son.

In its charge to the jury, after preliminarily advising it that it should award or assess as damages such an amount as would be commensurate with the injuries the mother sustained as a result of the accident, the trial court went on to give the usual stock instruction in such cases, which, in pertinent part, was as follows:

> "In reaching that result you should take into consideration the condition of her health, physically and *mentally* [emphasis supplied], immediately before the accident in comparison with what it was

> right after the accident and what it has been since * * * [which] was proximately and directly due to the accident. You will also consider, if you find that she suffered any injuries * * * to what extent such injuries * * * have persisted * * *, and whether any * * * are still present, whether she is [now] suffering [therefrom], and whether she will be affected by any such injuries for anytime from the present into the *future* [emphasis supplied]. Also * * * take into consideration * * * to what extent such injuries are calculated to have prevented, * * * [or] may continue to prevent, or affect, her in the pursuits or activities which she otherwise could have engaged in * * *."

The court then specifically advised the jury—and this is the crux of the objection—that in assessing damages to the mother, it "should not include any damages for any nervous or mental condition, in whole or in part, which * * * resulted from her fear that something will happen in the *future* [emphasis supplied] to her son."

The claim here is that this instruction, and the prior rulings of the court in excluding the evidence of Dr. Gillis, precluded the jury from considering the mental condition of the mother resulting from her fears about the condition of her son. We do not agree.

The rulings on the evidence were not improper under the circumstances. But, the Kujawas, relying primarily on *Langenfelder v. Thompson,* 179 Md. 502, 20 A. 2d 491 (1941) ["an expert witness should not be barred from expressing his opinion merely because he is not willing to state his conclusion with absolute certainty"], insist that it was error to exclude the opinion of Dr. Gillis, who was a neurologist as well as the treating physician, in that if the doctor did not wish to express an opinion grounded on probability he should have been allowed to do so on the basis of a possibility. There is no need to consider this contention at length, since it is obvious, as the trial court pointed out, that the witness in effect *excluded* himself from testifying further when he declared that he could "not be definite about it." The rulings of this Court have been consistent in holding that an expert witness must

base his opinion on probability and not on mere possibility. *Ager v. Baltimore Transit Co.*, 213 Md. 414, 421, 132 A. 2d 469 (1957).

The instruction on this point was likewise correct under the law of this State. In *Resavage v. Davies*, 199 Md. 479, 86 A. 2d 879 (1952), we held that damages could not be recovered for shock and resulting physical injuries to a mother, who, in a place of safety on her porch, had seen her daughters killed across the street by a negligently operated motor vehicle. Prior to this decision this Court had held in *Bowman v. Williams*, 164 Md. 397, 165 Atl. 182 (1933), that a father could recover for a mental condition precipitated by the negligence of the defendant whether the fear experienced by the plaintiff was for his own safety or for the safety of his children who were also in a place of potential danger.

In the instant case, the Kujawas seek to have us extend the rule of law laid down in the *Bowman* case by ruling that the instruction given should have allowed recovery of possible damages that were clearly too speculative. We reiterate that the instruction of the court was not improper. While the instruction as given did not expressly state that the mother could recover for a mental condition engendered by her fear at the time of the accident for the welfare of her son, we think the instruction implicitly covered this area of possible damages and that is all she was entitled to under the evidence. If there was any doubt about it, the Kujawas should have specifically excepted on that ground also; instead they limited the exception to the "consequences of the fear of what *will* [emphasis supplied] happen to her son."

The Kujawas (mother and son) further excepted to another part of the instructions that had advised the jury that "there is no evidence in this case of permanent injuries, except as to [the scars] on both of them: the young man has a scar [on his head], and * * * [the mother] said she had a scar on her knee, and * * * the injury to her thumb." However, when the court at the post-instruction conference pointed out that the instruction with regard to the absence of permanent injuries did not apply to the mother's injured thumb and the scar on her knee or to the scar on the son's head, the ex-

ception on behalf of the mother was withdrawn, but it was retained and enlarged as to the son's head injury on the ground that the court had not properly and accurately presented the evidence in that area, particularly that of Dr. Gillis, to the jury. In order to understand the exception in so far as the son is concerned, a summary of his injuries and of the testimony concerning them is essential.

The hospital records disclosed that the son had received a frontal fracture of the skull and a brain concussion. He was hospitalized for six days and was discharged as a "well boy." The son was not called as a witness, but the mother testified that he was more difficult to manage after the accident and that he had frequent headaches and dizzy spells and had twice fallen during "blackouts" after the accident. At the time of the trial he had been suspended from school for disciplinary reasons, but there was also evidence tending to show that he had been somewhat of a problem in school prior to the accident. Other than the medical evidence given by Dr. Gillis there was none to connect the condition of the son (at trial time) with the accident. Dr. Gillis testified that when he began to treat the son about a month after the accident he complained of headaches and dizziness. When asked what effect the injuries he had received might have on the son in the future, the doctor replied:

> "I cannot give you a definite opinion. It is too indefinite. This condition may persist or there may be some improvement. It is very, very difficult to determine a matter of that type. The only thing that makes me a little bit dubious about his future is the fact he was injured way back in 1956, * * * and there is still complaint of headaches and dizziness and difficulty in school. Now the usual head concussion symptoms clear up in a much shorter time than that. This boy still has headaches and dizziness. Therefore, I think there is a probability it may persist. I can't be sure, of course."

When asked how long the dizziness and headaches would persist, the doctor answered: "I cannot tell you at all. There

is no rule which I can go by * * *. The boy needs further treatment. I think his treatment is helping him some now." And when he was asked how much longer the treatments should continue, the doctor said "six months longer."

On these facts, the Kujawas contend, since there was some evidence of permanent injury to both the mother and the son, that the question should have been submitted to the jury and that the instruction was therefore erroneous. In this connection, we note that the instructions did not restrict the damages to the time of the trial for the court further instructed the jury that it could allow additional damages if it found "that either of them [meaning the mother and son] have injuries that are directly traceable to the accident and that such injuries may extend into the future, or how far into the future, but you cannot treat them as going to extend for the duration of [the] life of either of them."

The question here is whether the evidence produced was sufficient to also require submission to the jury of a question as to the permanency of the injuries in addition to the submitted issue involving "suffering in the future." We think not.

Certainly evidence tending to show only a *possibility* of permanency is not sufficient to take that issue to the jury. In *Mangione v. Snead,* 173 Md. 33, 195 Atl. 329 (1937), where the plaintiff was an infant at the time of the accident and there was testimony by his mother that the child was normal before the accident and that after the accident he was stupid and got into mischief all of the time, this Court, in pointing out that there must be something more than a conjecture or possibility of the fact to support a finding of permanent injury, said at p. 51:

> "[B]efore it can be said that the effect of an injury is permanent, it must appear that it is caused by some condition caused by the injury which is not likely to change, but such an inference cannot be drawn from the condition itself, when it is accompanied by no physical impairment or defect, is subjective, and offers no intrinsic *indicia* of its probable duration."

While it is a fact that Dr. Gillis testified that there was a "probability" that the headaches and dizziness of the son might persist, he did not and apparently could not say that his condition was such that it was "not likely to change." On the contrary, though he could not say how long the condition might last, he stated definitely that he thought "certainly six months longer." The doctor's testimony accurately described the son's actual condition and was sufficient to justify the instruction of the court that "such injuries may extend into the future" but could not be treated as extending "for the duration of the life" of the son.

A "permanent injury" has been variously defined as an injury that will "last throughout life," *Colby v. Thompson,* 207 S. W. 73 (Mo. App. 1918); an injury that may "be followed by permanent impairment of earning power or producing irremedial pain," *Herndon v. Waldon,* 47 S. W. 2d 1047 (Ky. 1932); and an injury "lasting during future life of injured party," *Sykes v. Republic Coal Co.,* 22 P. 2d 157 (Mont. 1933). The courts have also drawn a distinction between "suffering in the future" and a "permanent injury." See, for example, *Colby v. Thompson, supra; Stahlberg v. Brandes,* 299 S. W. 836 (Mo. App. 1927). We think the lower court was correct in refusing to allow the jury to consider permanency of injuries under the particular facts of this case. See *Baer Brothers, Inc. v. Keller,* 208 Md. 556, 119 A. 2d 410 (1956), and the cases therein analyzed.

The Kujawas further claim that the trial court erred in refusing to instruct the jury as to damages sustained by the father and son concerning the future loss of wages attributable to the injuries sustained by the son. The contention is not worthy of extensive consideration. Even if we assume the correctness of the proposition that a nine-year-old boy may be entitled to damages for the impairment of his capacity to earn a livelihood after reaching his majority, it would not be applicable here. In addition to the fact that there is nothing to substantiate the claim—the record does not show that he has ever earned anything and it is impossible to foretell without speculation what his earning capacity may be in the future—there is also no evidence to support the claim of "im-

pairment." Just as there was no legally sufficient evidence to establish permanency of the injuries, there is likewise no legally competent evidence to show impairment of earning capacity. The refusal of the court to instruct the jury on this issue was likewise proper.

The last contention in this lengthy part (ii) is that it was error not to allow the mother, as one of the parties plaintiff to the action, to prove the medical bills. After she had testified that she and her son had been to numerous doctors for treatment of their injuries, the doctors' unauthenticated bills were proffered as evidence. Except for two of them, the doctors were not present to verify the reasonableness of their charges, and the only testimony produced to establish that fact was that of the mother. Dr. Gillis and Dr. Raymond M. Curtis, who were present, testified that their charges were reasonable. In excluding the other medical bills, the court did not require the personal appearance of the billing doctors. The only requirement was that the plaintiffs should "have evidence" that the charges were reasonable. The medical bills, absent a showing of reasonableness, were properly excluded. Evidence of the amount or payment of medical bills does not establish the reasonable value of the services for which the bills were rendered or justify recovery therefor. 25 C.J.S., *Damages,* § 162(6), citing *Washington, B. & A. Elec. R. Co. v. Kimmey,* 141 Md. 243, 118 Atl. 648 (1922).

### (iii)

The Kujawas further contend that the trial court—by its caustic remarks to the mother in the presence of the jury and by its minimization of the extent of the injuries sustained by the mother and son in its charge to the jury—prevented them from having a fair trial and that they were thereby prejudiced. In their brief they concede that they neither objected to the remarks nor moved for a mistrial, and at the oral argument it was admitted that the point was weak. We agree. Moreover, since the failure to object or move for a mistrial constituted a waiver, the point or question could not be reviewed on appeal. See Maryland Rule 885. See also *Brawner v. Hooper,* 151 Md. 579, 135 Atl. 420 (1926). In fairness to the trial judge we think we should add that we find no

impropriety on the part of the court with respect to either of the alleged prejudicial remarks. The remarks the judge made to the mother were in fact caused by her continued interference with the orderly procedures of the court and the comments he made on the evidence were neither improper nor unfair in the circumstances.

(iv)

Even though the principal contention of the Kujawas is that the amount of the damages awarded by the jury was grossly inadequate, they utterly fail to present a sufficient basis for a review of the claim by this Court. Ordinarily, the question of whether a verdict is either excessive or inadequate is one for the trial court, in the exercise of its sound discretion, to decide on a motion for a new trial. We see nothing in the record to take this case out of the general rule.

(v)

This final question involves the propriety of granting the motion for the judgment *n.o.v.* in favor of the transit company. Since a new trial is not to be awarded, it appears that the Kujawas concede that they are no longer concerned as to whether the judgment *n.o.v.* should stand or fall. And since Ford, the other appellee, did not appeal from the order granting *n.o.v.*, we conclude we do not reach the question.

All judgments, including the judgment *n.o.v.*, will be affirmed.

*Judgments affirmed, the appellants to pay the costs.*