884 A.2d 142

**Richard H. LANDON, et ux.**

v.

**Pamela ZORN, et al.**

**No. 146, Sept. Term, 2004.**

Court of Appeals of Maryland.

Oct. 6, 2005.

Michael J. Winkelman (Kevin J. McCarthy, McCarthy & Costello, Bowie, on brief), for appellants.

Curtis H. Booth (Roy B. Cowdrey, Jr., Cowdrey, Thompson & Karsten, Easton, on brief), for appellees.

Michael Wein, Greenbelt, David M. Kopstein, Seabrook, Harry S. Johnson, Whiteford, Taylor & Preston, L.L.P., Baltimore, Amicus Curiae.

Argued before RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, GREENE and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

GREENE, J.

This matter arises from a medical malpractice action brought by Richard Landon and his wife, Joann Landon, against Pamela Zorn, M.D. and Atlantic General Hospital ("AGH").[1] The Landons contend that Dr. Zorn committed medical malpractice when she failed to diagnose Mr. Landon as suffering from necrotizing faciitis, or flesh eating bacteria. They argue that, as a result of Dr. Zorn's failure to diagnose his condition, Mr. Landon's right leg was amputated at the hip. Following a two-week trial in the Circuit Court for Worcester County, a jury returned a verdict in favor of Dr. Zorn. The jury found that Dr. Zorn did not breach the standard of care in her treatment of Mr. Landon. This appeal followed. We granted *certiorari* prior to consideration of the matter by the Court of Special Appeals. *Landon v. Zorn*, 385 Md. 511, 869 A.2d 864 (2005).

The Landons present two questions, which we have re-phrased, for our review:

1. Did the Circuit Court err by failing to *voir dire* the prospective jurors on the issue of tort reform?[2]

2. Did the Circuit Court err by failing to give a requested jury instruction and the Maryland Pattern Jury Instruction ("MPJI–Cv.") on informed consent?

For the following reasons we hold that the trial court was correct in refusing to give the Landons' proposed *voir dire* question, and we find the court's denial of the Landons' request for an instruction on informed consent was proper.

*Facts*

The parties have stipulated to the following facts for the purposes of this appeal:

---

1. AGH is not a party to this appeal.

2. The Maryland Trial Lawyers Association and the Maryland Defense Counsel, Inc. have filed *amicus* briefs regarding this question.

In January of 2001, the Atlantic General Hospital ("AGH") was party to a contract with Emergency Services Associates, P.A. ("ESA") pursuant to which ESA would provide staffing for the AGH's Emergency Department. Appellee Pamela Zorn, M.D. was an employee of ESA who was working in AGH's Emergency Department on January 8, 2001. At 7:38 a.m. on January 8, 2001, Appellant Richard Landon presented to the Emergency Department complaining of leg pain and flu-like symptoms over the preceding several days. A triage nurse initially assessed Mr. Landon, and he was thereafter evaluated by Dr. Zorn. Dr. Zorn then ordered medications and diagnostic tests. Dr. Zorn and the nurses observed Mr. Landon for several hours, and monitored his vital signs. Upon considering the results of the various tests, Dr. Zorn formed an initial impression that Mr. Landon had a flu-like syndrome and, that independent of the flu, pain from an old leg injury was flaring up. Based on the information available to her, Dr. Zorn was not satisfied that she had diagnosed the source of Mr. Landon's leg complaints. Consequently, she requested that Mr. Landon undergo an additional non-invasive radiological test, a CAT scan, to attempt to reach a diagnosis.

The contemporaneous medical records reflect, and Dr. Zorn testified at trial, that she tried at length to talk Mr. Landon into undergoing the CAT scan because she believed it would yield more information about his condition. Mr. Landon testified that he was not interested in having more testing done, and informed Dr. Zorn that he wanted to go home to sleep. Dr. Zorn testified that she told Mr. Landon that the CAT scan would provide more diagnostic information and that, without the CAT scan, she might not be able to diagnose his condition. Dr. Zorn then offered to let Mr. Landon stay in the Emergency Department for further observation. Mr. Landon again declined to stay and was thereafter discharged at 12:15 p.m., with a prescription for a muscle relaxant, and with instructions to get rest and drink fluids, and to return if he had any other problems or if his condition got worse. Although Appellants testified at trial

that Mr. Landon's condition got worse throughout the afternoon and evening, he did not return to AGH until nearly twelve hours later.

Dr. Zorn and Mrs. Landon spoke when Mrs. Landon called back to the Emergency Department with a medication question at approximately 4:45 p.m. At that time, Dr. Zorn reiterated her desire to perform more testing and a CAT Scan, and Mrs. Landon testified that she would attempt to talk her husband into returning to have the test. Mrs. Landon advised her husband of the conversation with Dr. Zorn. Mr. Landon did not recall that conversation, but did not deny that it took place. Mr. Landon reappeared at AGH approximately seven hours after that call, only after Dr. Zorn, who was home after her ER shift and getting ready for bed, learned that Mr. Landon had never returned for additional testing and called Mrs. Landon's home to instruct her to bring Mr. Landon back to AGH, even if she had to call 911.

Dr. Zorn testified that because Mr. Landon refused to undergo the CAT Scan she recommended and wanted performed, Mr. Landon was discharged against her medical advice. Dr. Zorn acknowledged that AGH had a "standard of practice" titled "Request for Leaving Against Medical Advice or Refusal of Treatment." ... She further testified, however, that she may not necessarily have been aware of the specific contents of the standard of practice at the time she was treating Mr. Landon. The standard of practice stated that "All patients who wish to leave the hospital against the advice of their physician or refuse a prescribed treatment must sign a release form."

Dr. Zorn testified that she elected not to use the release form when discharging Mr. Landon because she wanted to keep the lines of communication open because she wanted him to return for the CAT Scan, and she did not want to create an adversarial relationship with Mr. Landon as he left AGH. Medical expert witnesses testifying for the Appellants testified that Dr. Zorn's decision not to utilize the release form in discharging Mr. Landon was a breach in the

standard of care. However, Appellees' medical expert witnesses testified that the decision was not a breach in the standard of care and that the open lines of communication (the two phone calls after discharge between Dr. Zorn and Mrs. Landon) saved Mr. Landon's life.

After Dr. Zorn's call from her home, Mr. Landon returned to AGH just after midnight on January 9. He was then transferred to Maryland's Shock Trauma Center, where he was diagnosed with a group A beta hemolytic streptococcal infection, and where he underwent multiple surgeries, including a surgery which disarticulated his leg at the hip. Appellants' claim of medical negligence against the Appellees ensued. The claim proceeded through trial and the jury determined pursuant to an inquiry on the special verdict sheet that Dr. Zorn did not breach the standard of care in treating Mr. Landon. The Circuit Court for Worcester County thereafter entered judgment in favor of the Appellees.

## Discussion

### a. Scope of *Voir Dire*

The Landons contend that the Circuit Court abused its discretion in not asking a proposed *voir dire* question that they allege was intended to expose potential jurors' beliefs regarding tort reform. The question read:

Does any member of the jury panel have any preconceived opinion or bias or prejudice in favor of, or against plaintiffs in personal injury cases in general and medical malpractice cases in particular? If yes, please explain. Would this prevent you from fairly and impartially trying the facts and circumstances presented in this matter? [3]

---

**3.** The Landons raise the following issue in their brief:
 Did the Circuit Court commit reversible error by failing to *voir dire* the perspective [sic] jury on the issue of tort reform in a complex medical malpractice action?
 The Landons' proposed *voir dire* question inquired if any member of the jury had "any preconceived opinion or bias or prejudice in favor of, or

against, plaintiffs in personal injury cases in general and medical malpractice cases in particular." As stated, *infra*, the issue presented by the Landons is not reflective of their proposed *voir dire* question in that there is no connection to the issue of tort reform. Moreover, even if the Landons' proposed *voir dire* question addressed whether a juror held a particular belief in the area of tort reform, an affirmative answer to such a question would not immediately disqualify that juror. "[A] belief concerning a matter of debatable public policy raises no presumption that those persons could not properly apply the existing laws to the evidence." *King v. State*, 287 Md. 530, 536, 414 A.2d 909, 912 (1980).

In *King v. State*, the defendants were convicted by jury of possession and possession with the intent to distribute marijuana. *King*, 287 Md. at 531–32, 414 A.2d at 910. The *voir dire* question at issue in *King* asked jurors whether they thought the laws concerning possession and use of marijuana were wrong and should be changed. *Id.* at 532, 414 A.2d at 910. Two jurors answered "yes" to the question and were then excused for cause over the objection of the defense. *Id.* at 532–34, 414 A.2d at 910–11. We held that the trial court erred in excusing those two jurors without inquiring whether their beliefs that marijuana possession laws should be changed would prejudice them, or render them unable to apply the law to the facts before them. *Id.* at 539, 414 A.2d at 913. This Court noted that the prime concern when dismissing a juror for cause should be "whether a person holds a particular belief or prejudice that would affect his ability or disposition to consider the evidence fairly and impartially and reach a just conclusion." *King*, 287 Md. at 535, 414 A.2d at 912. We further stated:

> Many people may personally believe that a particular law is undesirable or should be changed, yet the existence of such a belief does not necessarily mean that the holder would refuse or be unable to apply the existing law to the facts of the case. . . .
>
> \* \* \* \* \* \*
>
> It is common knowledge that a significant segment of our society believes, as a matter of public policy, that the criminal laws relating to marijuana should be modified in one way or another. Such a belief concerning a matter of debatable public policy raises no presumption that those persons could not properly apply the existing laws to the evidence. Moreover, if all such individuals were automatically excluded from juries hearing criminal cases like the instant one, a large part of the community would be excluded from jury service in many criminal prosecutions under the laws relating to controlled dangerous substances. This would not be consistent with the policy that petit jurors "shall be selected at random from a fair cross section of the citizens of the State." Code (1974, 1980 Repl.

Vol.), § 8–102(a) of the Courts and Judicial Proceedings Article. *King*, 287 Md. at 536–37, 414 A.2d at 912. Tort reform is certainly "a matter of debatable public policy" to which jurors are entitled to their own beliefs. Thus, excluding jurors with such beliefs for cause in medical malpractice cases could conflict with the public policy that a jury pool represent a fair cross section of the community. If the Landons had presented a tort reform question to which jurors admitted to a particular position on the issue, jurors could not have been

 We begin by noting that, in Maryland, the scope of *voir dire* is limited. The purpose of *voir dire* is to expose "the existence of cause for disqualification ... it does not encompass asking questions designed to elicit information in aid of deciding on peremptory challenges." *Couser v. State,* 282 Md. 125, 138–39, 383 A.2d 389, 396–97 (1978) (quoting *Mason v. State,* 242 Md. 707, 709–710, 218 A.2d 682, 684 (1966)). "Questions not directed to a specific ground for disqualification but which are speculative, inquisitorial, catechising or 'fishing,' asked in the aid of deciding on peremptory challenges," are not permitted. *Davis v. State,* 333 Md. 27, 34, 633 A.2d 867, 871 (1993) (internal citation omitted). Moreover, "it is well settled that the scope of the questions propounded to jurors on their *voir dire* is largely in the discretion of the trial court." *Casey v. Roman Catholic Archbishop of Baltimore,* 217 Md. 595, 605, 143 A.2d 627, 631 (1958); *Langley v. State,* 281 Md. 337, 341, 378 A.2d 1338, 1340 (1977); *Poole v. State,* 295 Md. 167, 187, 453 A.2d 1218, 1229 (1983); *Davis,* 333 Md. at 34, 633 A.2d at 871; *Williams v. Mayor and City Council of Baltimore,* 98 Md.App. 209, 212, 632 A.2d 505, 506 (1993); *see also Thomas v. State,* 139 Md.App. 188, 197, 775 A.2d 406, 412 (2001) (noting that "absent a clear abuse of discretion, an appellate court will not disturb a trial judge's decision to ask or not ask a specific *voir dire* question. Our review of the *voir dire* process must be conducted on a case-by-case basis, accounting for the particular circumstances of each case. Rarely has an appellate court found abuses of discretion within the *voir dire* process.").

 Failure to ask all of a litigant's proposed questions on *voir dire* is not an abuse of discretion, if the questions proposed were more than adequately covered by the court's *voir dire* examination. *Miles v. State,* 88 Md.App. 360, 381, 594 A.2d 1208, 1218 (1991), *cert. denied,* 325 Md. 94, 599 A.2d 447 (1991). The court may exercise its discretion by refusing

automatically excused for cause as long as their beliefs did not affect their ability to consider the evidence fairly and impartially and to reach a just conclusion.

"to ask questions that it deems are speculative or insufficiently tailored to the particular case at issue." *Henry v. State* 324 Md. 204, 221, 596 A.2d 1024, 1033 (1991). There are, however, limited areas of inquiry which we have held are mandatory when applicable. They are:

> [R]acial, ethnic and cultural bias, religious bias, predisposition as to the use of circumstantial evidence in capital cases, and placement of undue weight on police officer credibility.... [T]hese mandatory areas of inquiry involve "potential biases or predispositions that prospective jurors may hold which, if present, would hinder their ability to objectively resolve the matter before them."

*Dingle v. State,* 361 Md. 1, 11 n. 8, 759 A.2d 819, 824 n. 8 (2000) (internal citations omitted). The failure of a trial judge to give one of these questions, when applicable, constitutes an abuse of discretion.

The Landons contend that the proposed *voir dire* question was designed to uncover potential prejudice against them and in favor of doctors in medical malpractice cases.[4] The Lan-

---

4. We will briefly address the form of the Landons' proposed question, an issue that was raised only during oral argument. In *Dingle v. State, supra,* we held that two-part questions requiring an answer only if the prospective juror thought that he or she could not be fair usurped the court's responsibility to impanel a fair and impartial jury. *See Dingle,* 361 Md. at 13, 759 A.2d at 825–26. The proposed *voir dire* question in the instant case may raise a *Dingle* issue because the question, as framed, could require potential jurors to respond only if they answered "yes" to both parts of the question which is framed in the conjunctive: "Does any member of the jury panel have any preconceived opinion or bias or prejudice in favor of, or against, plaintiffs in personal injury cases in general *and* medical malpractice cases in particular? If yes, please explain." (Emphasis added.) For example, it is possible that a juror could interpret the question to require an answer *only if* he or she has a bias or prejudice against *both* plaintiffs in personal injury cases *and* in medical malpractice cases in particular. Therefore, if a juror has a bias against one, but not both, that bias would not be revealed because of the manner in which the question is formulated. We, however, need not reach that issue.

We granted certiorari in this matter, *inter alia,* to focus on the Landons' question in the context of tort reform. This focus does not require us to reach a decision as to whether the Landons' question violates our holding in *Dingle.* The issue of the format of the Landons'

dons characterize this inquiry as "a tort reform" question. At the outset of our analysis, it is important to note that we find it difficult to glean the subject of tort reform from the question proposed. Even so, we acknowledge that this Court has already addressed the issue of *voir dire* questions and tort reform in *Kujawa v. Baltimore Transit Company*, 224 Md. 195, 167 A.2d 96 (1961). The plaintiffs in *Kujawa* suffered personal injuries as a result of an automobile collision. Although the jury awarded the plaintiffs damages, the trial court entered a judgment notwithstanding the verdict due to the plaintiffs' failure to produce sufficient evidence of negligence. *Kujawa*, 224 Md. at 199–200, 167 A.2d at 97.

The Kujawas alleged that the trial court erred in refusing to propound a question to jurors during *voir dire* that was intended to determine bias with respect to the size of jury verdicts.[5] *Kujawa*, 224 Md. at 200, 167 A.2d at 98. The question was proposed in order to counter the " 'steady stream of indoctrination' flowing from the insurance companies to the public generally" in an amount that would negatively influence the jury verdicts in negligence cases. *Kujawa*, 224 Md. at 201, 167 A.2d at 98. In response to the plaintiffs' contention that refusal to submit this question led to a jury that included persons "obviously predisposed against bringing in an adequate jury verdict," we held that, absent any prejudice to the plaintiffs, a question may be excluded if it is not properly formed to determine a potential cause for disqualification. *Id.* (citing *Grossfeld v. Braverman*, 203 Md. 498, 500–

---

question and its implications was not raised at the trial level, nor was it brought up in the parties' briefs; therefore, the issue is not properly before us. *See Stewart v. State*, 334 Md. 213, 221–22, 638 A.2d 754, 758 (1994)(citing Md. Rule 8–131(a)) (stating, *inter alia*, that ordinarily an appellate court will not decide an issue, unless it clearly appears to have been raised in or decided by the trial court).

5. The specific *voir dire* question requested was:
 Have you read any article or literature or have you heard any discussion recently on amounts of verdicts in negligence cases, and, if so, have you formed any ideas with reference to amounts of jury verdicts?
 *Kujawa*, 224 Md. at 200, 167 A.2d at 98.

501, 101 A.2d 824, 825 (1954) (citation omitted)). In affirming the trial court we further stated:

> Even if a juror had formed or expressed an opinion as to the adequacies or inadequacies of jury verdicts in negligence cases, that fact would not have disqualified him. A juror to be competent need not be devoid of all beliefs and convictions. All that may be required of him is that he shall be without bias or prejudice for or against the parties to the cause and possess an open mind to the end that he may hear and consider the evidence produced and render a fair and impartial verdict thereon.

*Kujawa,* 224 Md. at 201, 167 A.2d at 98 (citing *Garlitz v. State,* 71 Md. 293, 300, 18 A. 39 (1889) (citation omitted)).

Subsequently, the issue of *voir dire* questions addressing tort reform was revisited by the Court of Special Appeals in *Williams v. Mayor and City Counsel of Baltimore,* 98 Md. App. 209, 632 A.2d 505 (1993), *cert. denied,* 334 Md. 19, 637 A.2d 1192 (1994). The only issue tried in *Williams* was the amount of damages, as the defendant admitted that he negligently caused the automobile collision in question with the plaintiffs. *Williams,* 98 Md.App. at 210, 632 A.2d at 505. After the jury's failure to award any non-economic damages, the plaintiffs alleged error because of the trial court's failure to ask several questions during *voir dire* that resulted in alleged prejudice to their case for damages.[6] *Williams,* 98

---

6. Questions proposed by plaintiffs included:

1. Did any of the members of this panel hear the acceptance speech of President Bush at the Republican Convention in which he contended that trial lawyers and all the suits they file have contributed to the economic problems faced by our Country? If so, would what you heard keep you from fairly and justly deciding the issues in this case, especially as to compensation to be awarded?

2. Would any of the members of this panel be unable to fairly and justly decide the issues in this case especially as to compensation to be awarded because of all that you have heard and/or read about the effect of large jury awards on your liability insurance premiums?

3. Would any of the members of this panel be unable to fairly and justly decide the issues in this case especially as to compensation to be awarded because of all that you have heard and/or read about the effect of fraudulent or frivolous law suits for injuries, etc.?

Md.App. at 212, 632 A.2d at 506. In its affirmance of the trial court, the Court of Special Appeals addressed the position of our sister states on similar types of *voir dire* questions, including Montana's stance as voiced in *Borkoski v. Yost*, 182 Mont. 28, 594 P.2d 688 (1979). The Landons ask us to apply the basic principles of *Borkoski* to *voir dire* questions involving medical malpractice and tort reform.

Jerome Borkoski filed a medical malpractice and wrongful death action following the death of his wife, suing both the hospital where his wife received her care and two doctors.[7] *Borkoski*, 594 P.2d at 689. It was established during discovery that the insurance company that provided malpractice insurance to the defendant doctors had been actively involved in a campaign to influence jurors. *Id.* The campaign specifically targeted jurors and the focus of the advertisements "was that large jury awards would result in everyone paying higher insurance premiums," and appeared in several national magazines at the time the jury was impaneled. *Borkoski*, 594 P.2d at 689–90. As a result, Borkoski made a motion requesting permission to examine prospective jurors to determine whether they had been exposed to this campaign in any manner. *Borkoski*, 594 P.2d at 690. Borkoski's motion was denied and after the jury found for the defendants, Borkoski requested a new trial, alleging he had been denied a fair and impartial jury by the denial of his *voir dire* motion. *Id.* The *Borkoski* court affirmed the trial court, but acknowledged that the trial court should have allowed the inquiries to determine juror bias or prejudice. The court stated:

> [W]e hold that in appropriate cases an attorney upon voir dire may inquire of prospective jurors whether they have

---

4. Would any of the members of this panel be unable to fairly and justly decide the issues in this case especially as to compensation to be awarded because of all that you have heard and/or read about the high costs of medical care and gauging [sic] or even fraud by doctors in their billing for treatment done or even not done?
*Williams*, 98 Md.App. at 211, 632 A.2d at 506.

7. Borkoski settled with the hospital and they were not a party to the appeal.

any business relationship with insurance companies and whether they are policyholders of an insurance company named as a defendant or of a mutual insurance company involved in the case. We further hold that, upon a proper showing of possible prejudice, an attorney may inquire whether a prospective juror has heard or read anything to indicate that jury verdicts for plaintiffs in personal injury cases result in higher insurance premiums for everyone; if so, whether the prospective juror believes such materials; and if so, whether that belief will interfere with the juror's ability to render a fair and impartial verdict.

*Borkoski,* 594 P.2d at 694.

The Court of Special Appeals considered *Borkoski,* but declined to adopt its holdings. The intermediate appellate court noted that it was necessary to view *Borkoski* within the context of Maryland's *voir dire* jurisprudence, which supports *voir dire* as a tool for discovering information that would disqualify jurors and "support challenges for cause, and not for assisting in the exercise of peremptory challenges." *Williams,* 98 Md.App. at 217, 632 A.2d at 509. The *Williams* court noted that both our strong stance opposing the introduction of the issue of probable insurance coverage and the precedential effect of *Kujawa, supra,* would factor into the application of the *Borkoski* approach in Maryland. *Williams,* 98 Md.App. at 217, 632 A.2d at 509 (citing *Morris v. Weddington,* 320 Md. 674, 681, 579 A.2d 762, 765 (1990)) (other citations omitted). Ultimately, the Court of Special Appeals concluded that it was not necessary to decide if the *Borkoski* approach was authorized under Maryland law because the proposed *voir dire* questions were neither required under the *Borkoski* analysis nor required under Maryland law.

The Landons request that this Court "reconsider [its] previous holdings in light of the political, social and judicial change in climate which has occurred since the time *Williams* was decided." In its *amicus* brief, the Maryland Trial Lawyers Association argues that the Court of Special Appeals "left open" the issue of *Borkoski's* application in the proposal of *voir dire* questions addressing tort reform. The Maryland

Defense Counsel contends that, although the trial court in this case made the correct decision, we should take this opportunity to expand *voir dire* when an appropriate factual basis is proffered.

We decline the Landons' request to adopt the basic principles of *Borkoski* and to apply them to the facts of the case *sub judice.* The facts of this case do not warrant our expansion of the scope of *voir dire* in Maryland. Unlike the law of Montana, the scope of *voir dire* in Maryland is limited. The Landons' question can be distinguished from the question proposed in *Borkoski,* not only in its failure to address the issue of tort reform, but in its generality. *See Williams,* 98 Md.App. at 218, 632 A.2d at 509. The proposed question asks jurors about general bias against plaintiffs in lawsuits, and in malpractice cases in particular, and does not inquire about anything that can be construed as a tort reform issue.[8] In their brief filed in this case, the Landons offered several unsubstantiated assertions [9] regarding information that would

---

8. The question at issue here, moreover, was adequately covered by the questions that were asked of the jury during *voir dire.* The following questions were propounded to the jury to ferret out any bias:

 Have you, or any members of your immediate family, or any close personal friends of yours, ever filed a claim or lawsuit alleging medical malpractice that would affect your ability to judge this case or has any member of your immediate family been the subject of a malpractice claim?

 \* \* \* \* \* \*

 Have any of you heard any publicity through any of the mass media concerning this case which would affect your ability to judge the case ... other than those who answered before?

 \* \* \* \* \* \*

 Have you or any members of your immediate families ever been the plaintiff or defendant in any lawsuit?

 The question proposed by the Landons merely inquired about potential bias among litigants in lawsuits and medical malpractice cases in particular, and has no clear connection with the issue of tort reform.

9. The Landons allege that AGH "circulated through the community reports of how the medical malpractice crisis has affected them and has suggested that one big verdict will shut the hospital down." *Appellant's Brief* at 9. A review of the record does not reveal any suggestion, let alone sufficient evidence, presented by the Landons of this rumor

have prejudiced jurors; however, the questions proposed did not reflect any of the Landons' concerns. Even if prospective jurors had preconceived notions about plaintiffs in lawsuits, and in medical malpractice cases in particular, such beliefs would not automatically render them disqualified for cause. *See supra* note 4.

The Landons' proposed question is essentially a general question. It is not designed to elicit responses about the biases of the jurors with regard to tort reform. As a general question, it inquired into whether jurors had any "preconceived opinion or bias or prejudice" involving "plaintiffs in personal injury cases in general and medical malpractice cases in particular." The proposed question was not directed to a specific reason for disqualification and exclusion of jurors as required by Maryland law; thus, it was properly refused, in the court's discretion, on that ground. We have acknowledged that

> where the parties identify an area of potential bias and properly request *voir dire* questions designed to ascertain jurors whose bias could interfere with their ability to fairly and impartially decide the issues, then the trial judge has an obligation to ask those questions of the venire panel. Merely asking general questions, such as, "is there any reason why you could not render a fair and impartial verdict," is not an adequate substitute for properly framed questions designed to highlight specific areas where potential jurors may have biases that could hinder their ability to fairly and

during the *voir dire* proceeding in connection with their proposed questions. In support of their argument that this rumor was influential, the Landons contend that "the backdrop of no hospital care for an aging jury pool" potentially biased the jurors. Further, the Landons argue that they were prevented from exploring this bias by the trial court's refusal to pose the alleged tort reform question. We again note that none of the *voir dire* questions presented by the Landons addressed these concerns. No questions were proposed that addressed any information circulated by AGH, the specific contention that it could not financially withstand another plaintiff's jury verdict, or the potential influence that either of these alleged biases had on "an aging jury pool."

impartially decide the case. Those *voir dire* questions, however, should be framed so as to identify potential jurors with biases which are cause for disqualification, rather than merely identifying potential jurors with attitudes or associations which might facilitate the exercise of peremptory challenges.

*Davis,* 333 Md. at 47, 633 A.2d at 877.

It was the Landons' responsibility to propound *voir dire* questions designed to elicit potential bias from jurors, and not to bootstrap a tort reform argument on appeal to a general question inquiring into any potential "bias or prejudice" against plaintiffs in personal injury or medical malpractice cases. The trial court was well within its discretion in declining to propound the Landons' proposed question.

### b. Jury Instructions

The Landons next challenge the court's refusal to give two jury instructions, one proposed by them addressing the issue of contributory negligence, and the other the MPJI–Cv. 27:4, Informed Consent. The Landons contend that the two instructions "together should have been read to the jury to allow an appropriate understanding of [Mr. Landon's] refusal to submit to a CAT scan in this case." Further, they contend that by denying to give the two instructions, "the court deprived [Mr. Landon] of the full advantage of presenting his theory to the jury."

In *Wegad v. Howard Street Jewelers,* 326 Md. 409, 605 A.2d 123 (1992), we discussed the proper standard of review for a denial of a requested jury instruction. We said:

[T]o rule upon the propriety of denying a requested jury instruction, a reviewing court must determine whether the requested instruction was a correct exposition of the law, whether that law was applicable in light of the evidence before the jury, and finally whether the substance of the requested instruction was fairly covered by the instruction actually given.

*Wegad,* 326 Md. at 414, 605 A.2d at 126. *See also Farley v. Allstate Ins. Co.,* 355 Md. 34, 47, 733 A.2d 1014, 1020 (1999) (quoting *Wegad*); *Fearnow v. Chesapeake & Potomac Telephone Co.,* 342 Md. 363, 385, 676 A.2d 65, 76 (1996). The standard is based on the theory "that a 'litigant is entitled to have his theory of the case presented to the jury'" provided the instruction is a correct statement of the law, and that the statement of law is applicable given the facts presented at trial. *Wegad,* 326 Md. at 414, 605 A.2d at 126 (internal citations omitted). *See also The Sergeant Co. v. Pickett,* 285 Md. 186, 194, 401 A.2d 651, 655 (1979). The third inquiry is derived from Md. Rule 2–520(c) which provides that a court "need not grant a requested instruction if the matter is fairly covered by instructions actually given." [10] *Id.* The burden of showing reversible error and prejudice rests with the complaining party. *Farley,* 355 Md. at 47, 733 A.2d at 1020 (internal citations omitted). "If any one part of the test is not met, we will affirm the trial court's denial of the request for instruction." *Fearnow,* 342 Md. at 385, 676 A.2d at 76.

c. Contributory Negligence

■■■ The Landons requested that the trial court give the following special instruction regarding contributory negligence:

The Plaintiff cannot recover if the Plaintiff's negligence is a cause of the injury.

The defendant has the burden of proving by a preponderance of the evidence that the Plaintiff's negligence was a cause of the Plaintiff's injury.

Patients are entitled however to rely on their physician's advice. That reliance must be reasonable and justified. A

---

**10.** The full text of Md. Rule 2–520(c) is as follows:

(c) **How given.** The court may instruct the jury, orally or in writing or both, by granting requested instructions, by giving instructions of its own, or by combining any of these methods. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

Md. Rule 2–520(c).

patient is not in a position to diagnose his own ailments. As a consequence, it is not contributory negligence for a patient to follow a doctor's instruction or rely on the doctor's advice. In addition before the plaintiff can be guilty he must be made aware by the physician of the consequences of his action or actions. If the plaintiff is not told either because the physician fails to inform the plaintiff or the physician does not know of the potential adverse consequences the plaintiff has not been given enough information to make an informed decision and cannot therefore be guilty of contributory negligence.

The court declined to give the instruction, and instead gave an instruction based on MPJI–Cv. 19:11 [11] and 19:1.[12] The court instructed the jury that,

the patient cannot recover if the patient's negligence is a cause of the injury. Negligence, as I've indicated, is doing something a patient using ordinary care would do. Ordinary care, again, means that caution, attention or skill that a reasonable person would use under similar circumstances. The defendant has the burden of proving by a preponderance of the evidence that a patient's negligence was the cause of the patient's injury.

The instruction, as given, fairly covered the substance of the Landons' request. The court's instruction covered the law of contributory negligence and repeats almost verbatim the first two paragraphs of the Landons' requested instruction. Accordingly, it appears that the Landons are objecting to the

---

11. MPJI–Cv 19:11 Contributory Negligence—Generally, provides:

A plaintiff cannot recover if the plaintiff's negligence is a cause of the injury.
The defendant has the burden of proving by a preponderance of the evidence that the plaintiff's negligence was a cause of the plaintiff's injury.

12. MPJI–Cv 19:1 Definition, provides:

Negligence is doing something that a person using reasonable care would not do, or not doing something that a person using reasonable care would do. Reasonable care means that caution, attention or skill a reasonable person would use under similar circumstances.

failure to give the information contained in paragraphs three and four of the proposed instruction. In support of the propositions contained in paragraphs three and four, the Landons cite the cases of *Hill v. Wilson,* 134 Md.App. 472, 495, 760 A.2d 294, 306 (2000) (noting that "a patient is not in a position to diagnose his own ailments," but a patient's unreasonable delay in obtaining medical testing, examination, or treatment directed by a treating physician is evidence of contributory negligence) and *DiLeo v. Nugent,* 88 Md.App. 59, 73, 592 A.2d 1126, 1133, *cert. granted,* 325 Md. 18, 599 A.2d 90 (1991), *appeal dismissed,* 327 Md. 627, 612 A.2d 257 (1992).

In *DiLeo,* the Court of Special Appeals held:

We have recognized in the past that a patient is not in a position to diagnose her own ailments, appreciate the risks of medication or evaluate whether the prescribed course of treatment is in her best interest. As a consequence, it is not contributory negligence for a patient to follow a doctor's instructions or rely on the doctor's advice, to fail to consult another doctor when the patient has no reason to believe that the doctor's negligence has caused her injury, or to fail to diagnose her own illness.

*DiLeo,* 88 Md.App. at 73, 592 A.2d at 1133. *DiLeo* and *Hill,* which cited *DiLeo,* support the third paragraph of the Landons' requested instruction. They do not, however, support the fourth requested paragraph and the Landons direct us to no other case law to support the proposition. Nevertheless, assuming *arguendo,* that the special instruction was a correct statement of the law, we would still affirm the trial court's decision because the Landons can show no prejudice by the failure of the court to give the requested instruction.

The Landons, as the complaining party, have the burden of showing both prejudice and error. *Farley,* 355 Md. at 47, 733 A.2d at 1020. In the present case, the jury was presented with a special verdict sheet. The first question on the sheet stated:

1. Do you find that Plaintiffs have proven by the preponderance of evidence that Dr. Zorn breached the stan-

dard of the care of a reasonably competent emergency medicine physician?

The jury answered "No" to the question. The verdict sheet instructed the jury that if the answer to the first question was "No," they were to go no further. Consequently, the jury did not reach any of the remaining questions, including the one regarding contributory negligence. The Landons, therefore, can show no prejudice as a result of the court's refusal to give the requested instruction. The trial court's decision not to give the requested instruction is affirmed.

### d. Informed Consent

The Landons also challenge the trial court's refusal to give MPJI–Cv 27:4 pertaining to informed consent.[13] The Landons argue that "[Mr. Landon] was never advised of any potential risks of his refusing the CAT scan. More specifically, [Mr. Landon] was never advised that failure to submit to the CAT

---

13. MPJI–Cv. 27:4 provides:
> Before providing a specific type or course of medical treatment to mentally competent adult patient under non-emergency circumstances, a physician has a duty to obtain the consent of the patient after disclosing to the patient:
> 1. the nature of the condition to be treated;
> 2. the nature of the treatment being proposed;
> 3. the probability of success of that treatment;
> 4. the alternatives, if any, to the proposed treatment; and every material risk of negative consequences of the treatment being proposed;
> 5. every material risk of negative consequences of the treatment being proposed.
> A material risk is a risk that a physician knows or ought to know would be significant to a reasonable person who is being asked to decide whether to consent to a particular medical treatment or procedure.
> The purpose of the required explanation is to enable the patient to make an intelligent and informed choice about whether to undergo the treatment being proposed. A physician is liable for any injury caused by the physician's failure to disclose the patent material risk. In order to impose liability upon the physician, the plaintiff must prove that a reasonable person would not have consented if properly informed. The question is not whether this particular plaintiff would have consented if given proper information, but whether a reasonable person in the same circumstances would have consented or not. MPJI–Cv. 27:4.

scan could have life-threatening consequences for him." His argument continues, "Dr. Zorn was unable to inform Mr. Landon as to what, if any, risks Mr. Landon would face by not having the CAT scan done. He was therefore unable to make an informed choice as to whether or not he should have the CAT scan done."

Dr. Zorn responds that the issue of informed consent was not pled. She cites the case of *Zeller v. Greater Baltimore Medical Center,* 67 Md.App. 75, 506 A.2d 646 (1986), for the proposition that "where there is no properly [pled] claim for lack of informed consent, and no attempt to amend the pleadings during trial, a trial court may properly deny a requested jury instruction on that topic." Dr. Zorn also argues that, even if the lack of informed consent argument had been properly pled, the trial court was correct in denying to give the instruction because the evidence adduced at trial did not support a claim for informed consent.

In Maryland, a cause of action for lack of informed consent must be based on a failure of a physician in a non-emergency situation to get consent from a patient prior to performing an affirmative act on the patient. The seminal case in Maryland regarding the doctrine of informed consent is *Sard v. Hardy,* 281 Md. 432, 379 A.2d 1014 (1977). In *Sard* we stated that,

the doctrine of informed consent imposes on a physician, before he subjects his patient to medical treatment, the duty to explain the procedure to the patient and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment.

*Sard,* 281 Md. at 439, 379 A.2d at 1020. The doctrine, we noted, "follows logically from the universally recognized rule that a physician, treating a mentally competent adult under non-emergency circumstances, cannot properly undertake to perform surgery or administer other therapy without the prior consent of his patient." *Sard,* 281 Md. at 438–39, 379 A.2d at

1019. Subsequently, in *Reed v. Campagnolo*, 332 Md. 226, 630 A.2d 1145 (1993), we noted that "one's informed consent must be to some treatment." *Reed,* 332 Md. at 241, 630 A.2d at 1152. We cited with approval a number of New York cases that stand for the proposition that " 'a cause of action based upon [the doctrine of informed consent] exists only where the injury suffered arises from an affirmative violation of the patient's physical integrity.' " *Reed,* 332 Md. at 242, 630 A.2d at 1153 (internal citation omitted). *See also Arrabal v. Crew–Taylor,* 159 Md.App. 668, 862 A.2d 431 (2004) (holding that the physician's "decision to take no affirmative action may have amounted to a violation of the professional standard of care, but [the physician] was not obligated to obtain his patient's consent to his non-action").

The Landons contend that Dr. Zorn was negligent in failing to inform Mr. Landon of the risk associated with not having a CAT scan. We find this argument unpersuasive. First, as stated previously, "a cause of action based upon the doctrine of informed consent exists only where the injury suffered arises from an affirmative violation of the patient's physical integrity." There was no evidence presented, to support a conclusion that Dr. Zorn committed any affirmative action in violation of Mr. Landon's physical integrity. Dr. Zorn recommended a diagnostic test, and Mr. Landon refused to submit to that test. The Landons' theory of liability, however, are premised upon what Dr. Zorn allegedly failed to do in her treatment of Mr. Landon. Assuming for the sake of argument that Dr. Zorn's failure to inform constituted an affirmative act, the Landons, however, failed to present any expert opinion testimony to establish that the professional standard of care required that Dr. Zorn inform Mr. Landon of the risks associated with not submitting to a CAT scan. Moreover, the Landons have not directed this court to any case holding that it is a breach of the standard of care for a doctor to fail to disclose those risks. Accordingly, the Landons were not entitled to an informed consent instruction and the trial court did not err in refusing to give the requested instruction.

**JUDGMENT OF THE CIRCUIT COURT FOR WORCESTER COUNTY AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.**